Filed 5/21/21  P. v. Watson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045141 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1370223) |
| v. | |
| JAMES ANTHONY WATSON, | |
| Defendant and Appellant. | |

Defendant James Anthony Watson was convicted by a jury of attempted murder (Pen. Code[1], §§ 187, 664) of his wife, and the jury found true allegations that he had acted with premeditation and deliberation (§§ 189, 664, subd. (a)) and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The court sentenced him to an indeterminate term of seven years to life for the attempted murder count consecutive to a term of 25 years to life for the firearm enhancement.

On appeal, defendant claims that (1) the trial court made prejudicially erroneous evidentiary rulings concerning defendant's post-arrest statements, (2) the court erroneously and prejudicially excluded some evidence of his wife's conduct outside his presence or knowledge, (3) the court prejudicially erred in precluding the defense expert from testifying that defendant was suicidal at the time of the shooting, (4) the court prejudicially erred in denying defendant's request for a modified version of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

CALCRIM No. 603, the heat of passion instruction, (5) the prosecutor prejudicially misstated the law concerning provocation and the burden of proof, (6) the court's errors and the prosecutor's misconduct were cumulatively prejudicial, (7) a sentence of seven years to life for the attempted murder count was erroneous, and (8) defendant is entitled to a remand for the court to consider mental health diversion and to exercise its discretion to strike the firearm enhancement under statutes enacted after defendant was sentenced. The Attorney General concedes that a remand is required for the court to consider mental health diversion and to exercise its discretion to strike the firearm enhancement. We accept the concessions and reject the remainder of defendant's contentions.

## I. THE PROSECUTION'S CASE

On December 3, 2013, at about 11:00 a.m., defendant called 911 and said that he had tried to kill his wife and himself.[2] He said that he had tried to shoot her and himself, but "I wasn't successful." Defendant told the 911 operator that he thought he had shot his wife, though he was not sure. He claimed to be "hurt really bad" from trying to break into the house after his wife locked him out. Defendant stated that his wife was "severely mentally ill" and that he had been trying to take care of her for years.

Defendant told the 911 operator that the shooting had taken place half an hour earlier, and his wife had then taken a shower and left the house. He angrily stated that he had "wanted to fucking die today." Defendant bemoaned the fact that he had bought "a piece of shit gun" that "didn't work." He said "I should [have gotten] a better gun." Defendant said he had "planned it for months." Although he had not shot himself, he said he had cut himself breaking the window.

Police officers arrived a few minutes after defendant's 911 call and arrested defendant. Defendant, who was wearing only underwear, had small cuts on his hands, back, and shoulder, and dried blood on his body. Gunshot residue was found on

---

[2] An audio recording of the 911 call was played for the jury at trial.

defendant's hands. The apartment was very dirty, and there were dirty clothes on the floor in every room and what appeared to be feces on the carpet and on a mattress in the living room. A .25-caliber semiautomatic pistol was on the dining room floor, the dining room window was broken, and there was blood throughout the apartment and blood on wads of paper towels. The gun contained no bullets. Two bullet casings were outside the front door. Another casing was found in the bedroom of the apartment near blood and a tooth. A portion of a bullet and two live .25-caliber rounds were also on the bedroom floor. A bunch of bloody clothing was found in the bathroom.

Defendant's wife, Roxana Watson, was found about half a mile away on a sidewalk near a strip mall. She was confused and disoriented and had blood on her jacket and hands. Roxana had bullet wounds to both her right thumb and her jaw. The bullet that had damaged her jaw had knocked out three of her front teeth. Surgery was necessary to remove bone fragments and a bullet fragment from her jaw.

While in jail, defendant bragged about falsely claiming to be suicidal so that he could talk to a mental health worker about a CPAP machine he needed in jail for his sleep apnea.

## II. THE DEFENSE CASE

Defendant testified at trial as the first defense witness. At the time of the 2017 trial, defendant was 56 years old. When he was 17 years old, he began self-medicating with marijuana and alcohol. At age 20, he began using cocaine and methamphetamine. In 1983, he began working as a truck driver. Defendant met Roxana around 1990, and he fell in love with her. They married in 1995 and began living with defendant's grandparents.

In late 2001, Roxana had "a nervous breakdown." She began going out at night and not coming home until the next morning. Several times defendant filed a missing person report, and he also drove around looking for her. He was "scared to death something was going to happen to her" because she was very small and "can't defend

3

herself very well."[3]  He tried to get her hospitalized for her own protection, but she refused.  She denied that anything was wrong with her and would not take medication.  By 2005, she had been hospitalized two or three times for a month at a time.  Defendant was distressed because Roxana was "suffering" and unable to take care of herself.  She did not cook, bathe, or comb her hair.  Roxana did not want to be around other people or be touched.

At the end of 2005 or the beginning of 2006, "Kaiser suggested" that it would be better for defendant and Roxana to live apart.  Defendant testified that he had been "suffering from mental illness for years."  Their relationship was "very strained" due to their mental illnesses and his drug use.  He had become dependent on narcotic pain relievers after back surgery.  Defendant testified that Roxana had "paranoid schizophrenia in her," and he believed that his drug use was responsible for her mental illness.  They agreed to separate, and they found an apartment for Roxana.  Defendant continued to visit her regularly and to bring her money for groceries.

At some point around that time, defendant told Roxana "why don't I just shoot you and shoot myself" so that she would not have to suffer anymore.  Roxana told her doctor about this statement, and it was reported to the police.  As a result, defendant was hospitalized, and the police took away his guns.  He was subsequently hospitalized again after he told his psychiatrist that he was suicidal.  Because Roxana could not take care of herself, she was eventually hospitalized again.  She did not want to live with him, so when she was released from the hospital defendant found a board and care home for her to live in.  He paid for the board and care and visited her regularly.  Roxana lived in a series of board and care homes before her son agreed to have her live with him.

---

[3] Defendant was about six feet tall and weighed about 250 pounds, while Roxana was petite and weighed around 100 pounds.

Although she remained "severely mentally ill" while she lived with her son, she was "much happier" living with her son than at the board and care homes. But in 2012 her son decided to move to Kentucky. Roxana chose to live with defendant rather than move to Kentucky with her son. After they resumed living together, defendant found it frustrating that Roxana tended to put his "personal things" on the floor. She told him that she "didn't love [him] anymore," but he continued to love her.

In May 2013, defendant lost his job and had only disability income thereafter. He had "thought about suicide for years." After he lost his job, he sometimes did not take his medication and instead went on multi-day methamphetamine "binges" that left him in "extreme pain." In June or July 2013, defendant bought a gun so that he would have "a way to kill myself." He kept the loaded gun wrapped up in clothing on the living room floor.

His relationship with Roxana became "very, very strained" after he lost his job. When she asked him for money and he told her that he had none, she did not believe him. Roxana continued to leave the house at night, and defendant could not always find her. He would call the police, and the police would find her.

On Tuesday, December 3, 2013, defendant had been awake since the previous Friday after taking drugs with a friend. He was in pain and had run out of pain medication, and he had not been taking his medication for his bipolar disorder. Defendant felt "hopeless," "extremely distraught, [and] overwhelmed" because he did not expect to have the money to pay the rent in a couple of days. His disability income had "just about run out." He was "broke" and had "no where to turn." He expected to become homeless and have to live in his car, and he believed that Roxana would leave the car and go wandering around at night when he was asleep. He "couldn't deal" with that. Defendant "wanted to die," and he was afraid to leave Roxana alone. Therefore, he "wanted to take [his] wife with [him] because nobody was going to take care of her." He

5

felt that he could not "live with that stress anymore" of worrying about Roxana wandering around at night.

Defendant asked Roxana for a "hug," and she "said no" and turned away from him. The two of them had not had any physical contact since 2001. They were both sitting in the living room of their apartment. When she refused to hug him, "something inside [him] just snapped." "I want to die. And my wife has been suffering for years and if I die nobody is going to take care of her. I couldn't leave her alone in the world so I wanted her to go to heaven with me." He got up, retrieved the gun, sat back down, and unwrapped the gun. The next thing he testified to was Roxana taking the gun from him and throwing it out the window. Defendant went outside and retrieved the gun, but when he tried to reenter the apartment the front door was locked. He fired two shots at the front door lock, but it did not open. He then ran around to the dining room window, broke the window with the gun, and climbed in the window. Roxana was still in the apartment. Defendant testified that he did not remember anything else until the police arrived.

On cross-examination, defendant claimed that he did not remember most of the events of that day, the 911 call, or his statements to the police. He admitted that he had pointed the gun at Roxana, that he intended to kill her, and that she had a bloody head wound after he pointed the gun at her. He also admitted that he remembered the gun failing to fire, either because it was jammed or because he failed to take off the safety. After that the gun was fired again. Defendant admitted that his intended use of the gun when he bought it was to kill his wife and himself. However, he denied any memory of shooting his wife. He did testify that he remembered Roxana taking the gun from him, running into the bedroom, and throwing the gun out the window. Defendant also testified that when he tried to shoot his way back into the apartment he still wanted to kill his wife and himself. His motivation for killing Roxana remained his belief that he "couldn't leave her with nobody to take care of her."

6

Defendant also admitted that he had lost his job because he told a coworker "that if [defendant] called him one day and told him not to go to work he shouldn't go to work because [defendant] would be bringing an AK-47 and hand grenades and blowing up the place."[4] He complained that the firing was unfair and that his employer was just using his statement as a reason to get rid of him because he was a drug addict and had sustained numerous workplace injuries. After he lost his job, he continued to collect $800 a week in disability benefits and his health insurance remained in effect.

Defendant testified that when "things got stressful" he would leave the apartment and go to his friend's house or his mother's house. He did so on a weekly basis, and he would be gone for as much as a day or two. Roxana was never hurt while he was gone.

A longtime friend of defendant testified that he stayed with defendant and Roxana for "a few days here and there . . . [m]ainly during the wintertime" in 2012 and 2013 when he was homeless. He also said that he saw the couple once or twice a month. He observed that Roxana was "[v]ery distraught" and "[n]ot mentally stable." She "periodically" washed the front door with "a whole bottle" of dishwashing liquid. Roxana would yell at defendant and walk around continuously. She frequently wanted to go shopping at night, and defendant would prevent her from doing so, which upset her. Roxana seemed upset that the friend was there.

Psychologist Rahn Minagawa testified as an expert "in the area of psychology." He testified that "suicide is a prominent symptom of depression." Minagawa conducted a "full psychological evaluation" of defendant in 2014. He first met defendant three months after the shooting. He determined that defendant was depressed and anxious. Minagawa also diagnosed defendant with "a mood disorder, bipolar disorder Type 1 tied with depression" and "substance abuse problems dependence . . . ." He reviewed records

---

[4] Defendant had told the police about this during his December 3, 2013 interview. A video of this interview was played for the jury by the prosecution as rebuttal evidence.

of defendant's treatment back to 2006, and defendant's "suicidal feelings, feelings of hopelessness" "were present . . . back several years." Defendant had previously been diagnosed with bipolar 1 disorder. Minagawa concluded that defendant's bipolar 1 disorder was in partial remission and that his "anxious distress" was moderate. Defendant's records showed that he had been involuntarily hospitalized multiple times for depression, and guns had been removed from his possession. His first hospitalization occurred after he threatened to shoot Roxana to "[p]ut her out of her misery." Defendant was hospitalized three additional times between 2010 and 2012 due to his reports that he planned to commit suicide. Defendant had never attempted suicide though.

Minagawa testified that defendant's ability to make rational decisions was impaired by his depression beginning in May 2013 and continuing through the shooting. In response to a hypothetical based on defendant's circumstances at the time of the shooting, Minagawa testified that such a person would not be thinking rationally. However, he conceded that people without mental disorders act irrationally "all the time."

Frances Watson, defendant's mother, testified that Roxana would leave the house and wander the street, and that she "just wasn't right" and was "basically just shut off." Roxana was unable to care for herself and would not take her medication or see doctors. Once, Roxana was gone for a whole day and returned "just walking like a zombie," with a sunburned face, and unresponsive.

Roxana's brother, Jaime, testified that Roxana had a "nervous breakdown," was hospitalized about 10 times, became "very afraid," and "was diagnosed with schizophrenia paranoia." Roxana would walk around the house for hours at a time and would not sleep at night. He testified that family members tried to get Roxana to take her medication, but she would only pretend to take the pills and then spit them out when no one was looking.

## III.    THE PROSECUTION'S REBUTTAL EVIDENCE

The prosecution played for the jury defendant's police interview, which had been conducted at the police station half an hour after defendant's 911 call. During this interview, defendant told the police that, after he lost his job in May 2013, he did not apply for social security disability benefits right away because he was going to kill his wife and himself. He did not follow through because he thought things would get better. But he got tired of waiting for that to happen. He told the police that his wife "acts crazy every day" and "drives me nuts." Defendant told the police that his wife was "severely mentally ill," but she would not take medication because she "thinks there's nothing wrong with her."

On December 3, 2013, he was "coming down from a couple days of doing meth," and "my wife was driving me crazy." "I said 'You know what? This is a good day to die'. And I grabbed the gun." He had bought the gun for $160 four months earlier. It came with two rounds, and he also bought a "box of shells." "I wanted to make sure that my wife wouldn't suffer in any way, and the only way I knew that she wouldn't suffer is if she was dead." The gun was already loaded when he grabbed it. He "tried to sneak up on her" in the living room, but she saw him and grabbed the gun. They struggled over the gun. His wife got the gun away from him. He got it back from her, but it "jammed" at first. By the time he able to fire the gun, they were in the bedroom lying on the floor. He fired twice in the bedroom. While he was trying to fire it, he ejected multiple rounds. She got the gun away from him and threw it out the window. He went outside to retrieve the gun, and she locked him out. He shot the door twice trying to get back in. He broke the window, climbed in, and fell on his back.

Defendant repeatedly blamed the gun for his situation because it had not performed properly. When he was asked what had "triggered" him to shoot his wife, he said he was sick of living, sick of listening to his wife suffer, and no one was ever going to help his wife. After the shooting, his wife left the apartment, and he "should have"

9

killed himself. He said that he did not do so because he was worried about his wife. Nevertheless, he asked the officer to give him a gun so he could kill himself. "All I wanna to do is kill myself." "Just let me kill myself."

## IV. PROCEDURAL BACKGROUND

The defense at trial was that defendant had acted in the heat of passion due to his desire to kill himself and therefore should be convicted of only attempted voluntary manslaughter. Defendant's trial counsel argued that defendant was guilty of attempted voluntary manslaughter because he was "overwhelmed by feelings of hopelessness and despair that were generated over years of caring for Roxana . . . ." Defendant's trial counsel further argued that there was "good evidence that when he grabbed the gun he wanted to die." "His decisions were not rational. He could only focus on the hopelessness of his situation. And he reacts from emotion because he cannot regulate his emotions at that time." "[I]n this case, the intense emotion is hopelessness and despair. That is an emotion that is powerful and it can cause a person to act without due reflection or reason." As to provocation, she argued: "Provocation can be anything. It can be a word. It can be an action. It can be a refusal to act. It can be right there in the moment right when something happens, a snap. Or it can be buil[t] up over a long period of time. It can be a combination of things that happen[ed] in the past and how those reflect on something that happens right now." She argued that Roxana provoked defendant by refusing to hug him.

After the guilt phase resulted in a guilty verdict on the attempted murder count and true findings on the premeditation and firearm allegations, the parties waived their rights to a jury trial on sanity. The court held a bench trial on sanity and determined that defendant was sane when he committed the offense. Defendant was committed to an indeterminate term of seven years to life for the attempted murder count consecutive to a term of 25 years to life for the firearm enhancement.

10

## V.    DISCUSSION

### A.    *Defendant's Post-Arrest Statements*

#### 1.    *Background*

During in limine motions, the prosecutor told the court that she was not currently seeking to admit defendant's "alleged threats to his workplace." However, her position was contingent on the court's ruling on the defense's request for admission of defendant's post-arrest statements to the police. The prosecution opposed the defense's request.

The defense claimed that defendant's post-arrest statements were nonhearsay or admissible under Evidence Code section 1250 or admissible as defendant's statement of his then-existing mental or physical condition. For example, the defense argued that defendant's request that the officer shoot him was nonhearsay. The prosecution argued that the statements were inadmissible because they were untrustworthy.

The court viewed the "fundamental" question as whether, under the circumstances, defendant's post-arrest statements "could be admitted without the defendant taking the stand when offered by the Defense . . . ." The court stated that it was "balancing" factors under Evidence Code section 352, and it concluded defendant's post-arrest statements "should not be admissible, absent the defendant perhaps testifying" and those statements "becoming relevant." The court concluded that there was "sufficient reason to believe" that, under the circumstances, the statements were untrustworthy due to defendant's motive to fabricate. The court, relying on Evidence Code section 352, rejected admission of the statements as nonhearsay, spontaneous statements, or state of mind evidence. The court ruled that, even if defendant testified, the video of his statements to the police would still be inadmissible unless his statements fell within a hearsay exception. It stated that it would consider whether some of defendant's statements were admissible nonhearsay if defendant testified.

11

The defense subsequently renewed its request for admission of "nonhearsay" statements of defendant to the police, which it claimed were admissible "to show state of mind." Defendant's trial counsel argued that defendant's request that the police kill him was relevant to show defendant's state of mind at the time of the shooting. The defense theory was that defendant's alleged desire to kill himself meant that he had not considered the consequences of killing Roxana. His trial counsel argued that defendant was "in a passionate state of hopelessness and despair" at the time of the shooting. The defense position was that defendant's post-arrest statements "prove the strengths of his passion . . . ." The renewed request was limited to the statements that did not expressly say that he wanted to die, which the defense conceded would be hearsay; the defense sought admission of only defendant's statements asking the police to kill him or let him kill himself. The court excluded these statements under Evidence Code section 352 because there were "too many hallmarks of concern when it comes to trustworthiness and reliability in the balancing of probative value versus prejudicial impact should they be introduced absent [defendant] testifying . . . ." The court said it would reconsider the admissibility of these statements if defendant testified.

After the defense case, the prosecution played a video of the police interview for the jury as rebuttal evidence. Although the prosecution had sought to redact defendant's "suicidal statements" during that interview under Evidence Code section 352, the court accepted the defense's position that those statements were admissible under Evidence Code section 356.

### 2. Failure to Hold Evidence Code section 402 Hearing

Defendant maintains that his state of mind defense "depended on the admission of his post-arrest statements." He contends that the trial court prejudicially erred by "requiring appellant to testify before the jury in order to admit his statements." His position is that the trial court was required to hold an Evidence Code section 402 hearing outside the presence of the jury at which he "could have testified regarding the

12

trustworthiness of the evidence." He claims that the trial court's failure to hold such a hearing erroneously "forced him to testify."

A trial court is not required to hold an Evidence Code section 402 hearing to consider the admissibility of evidence. "The court *may* hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." (Evid. Code, § 402, subd. (b), italics added.)

While a trial court *must* hold an Evidence Code section 402 hearing to "determine the question of the admissibility of a confession or admission of the defendant . . . if any party so requests," defendant's attempt to secure admission of his extrajudicial statements did not concern a confession or admission, and he admits that he did not request an Evidence Code section 402 hearing. Thus, the only available argument is that the trial court *abused its discretion* in failing to *sua sponte* hold an Evidence Code section 402 hearing. Defendant has not satisfied his burden of showing that the trial court abused its discretion in this regard. Defendant's trial counsel never even suggested to the trial court that he wanted to have defendant testify at a hearing outside the jury's presence or that he wished to offer any other evidence relevant to the admissibility of the proffered evidence at such a hearing. Accordingly, the trial court had no reason to even suspect that such a hearing was merited. We find no abuse of discretion in the trial court's failure to hold an Evidence Code section 402 hearing.

Defendant also claims that the trial court's ruling that his post-arrest statements were inadmissible violated his constitutional rights because it forced him to testify. Although he cites several United States Supreme Court cases as support for this argument, none of them involved a defendant who was precluded from introducing his own hearsay statements.. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294 [due process violation to preclude defendant from implicating a third party by either cross

13

examining the third party or presenting witnesses to whom the third party had made admissions]; *Green v. Georgia* (1979) 442 U.S. 95, 97 [due process violation to preclude defendant from introducing hearsay confession of third party]; *Washington v. Texas* (1967) 388 U.S. 14, 22 [due process violation to preclude defendant from presenting testimony from alleged accomplice].)  Defendant's reliance on *In re Ali* (1964) 230 Cal.App.2d 585 is also inapt.  *Ali* concerned the denial of a continuance that resulted in the defendant being deprived of counsel when he was forced to choose between his right to counsel and his right to a jury trial.  (*Id.* at pp. 587-588.)  The Court of Appeal noted that "[t]he exercise of one constitutional right cannot be conditional upon the denial of another."  (*Id.* at p. 591.)  That statement has no applicability here, as defendant has failed to establish that he had a *constitutional right* to present his own hearsay statements. Defendant has not established that the trial court *erred* in ruling that his postarrest hearsay statements were inadmissible.  Thus, there is no support for defendant's claim that he was "pressured to testify . . . as the result of trial court error."

### 3. *Nonhearsay Statements*

Defendant contends that some of his postarrest statements were nonhearsay and that the court therefore erred in ruling that those statements were inadmissible under Evidence Code section 352.  The statements he identified below as nonhearsay consisted largely of defendant's exhortations to a police officer to kill him or "let me kill myself" and his statements about Roxana.  He claims that these statements were "offered for the non-hearsay purpose of establishing appellant's suicidal state of mind at the time of the crime and his concern for his wife."  In his view, the trial court's Evidence Code section 352 balancing was defective because the court erroneously considered the trustworthiness of the statements.  Defendant maintains that the court had no basis for finding that the probative value of the statements was outweighed by prejudice as there was no potential prejudice.  He claims he was prejudiced by the court's ruling because it "forced him to testify," and his testimony was prejudicial to his defense.

14

Initially, we consider the group of statements that defendant claimed were nonhearsay and were not part of the video ultimately introduced by the prosecution. These statements were not included by the prosecution in the video because they occurred before defendant was informed of his constitutional rights. One group of these statements concerned Roxana's condition and needs and defendant's concern for her. Defendant asked the officer: "How would you feel if, if you, your wife was . . . wandering the streets . . . how would you feel?" "I don't care about my injuries. All I care about is my wife." "My wife needs long term care." "[W]ho's gonna keep me updated on my wife." "Where's she at and, and everything." "[S]he's severely mentally ill . . . she needs round the clock care." "[S]he can't take care of herself. She can't feed herself. She has no money. She has nothing." "She's got nobody. She's got no place to live!" "She's got nobody to take care of her." A couple of defendant's pre-video statements concerned his own desire to kill himself. "I just wanna know how long . . . to get outta here to fuckin' kill myself so I can fuckin' get it over with." "[Y]ou can just let me die of fuckin' pneumonia."

Because defendant's statements about Roxana's condition and needs and his concern for her had no probative value if they were not true, it was not possible to separate their hearsay content from any nonhearsay content. They were not probative just because he made the statements. His statements about what he "care[d]" about had no probative value if they were not true. Similarly, his statement that he wanted to "kill myself" was probative only if true. There was no apparent relevance to the remaining statements: his question to the officer about how the officer would "feel" if "your wife was . . . wandering the streets" and his reference to dying of pneumonia. The first statement had no relevance unless it was true that Roxana was "wandering the streets," which would be hearsay. The second statement was made while defendant was complaining about how cold he was due to the fact that he had no clothes. We find no abuse of discretion in the trial court's determination, under Evidence Code section 352

15

that any minimal relevance of the nonhearsay content of these two statements was substantially outweighed by the potential that their admission would sidetrack or confuse the jury.[5]

The remaining statements identified by defendant below as nonhearsay were all included in the video introduced by the prosecution. The first of these statements occurred when defendant was informed of his constitutional rights. Defendant responded: "I don't want any rights." It is not apparent what nonhearsay probative value this statement had. The next statement identified by defendant is: "Now I got no way of knowing what's gonna happen to her. That's why I wish you would just fuckin' kill me. I don't care if I fuckin' die now." After that, defendant said: "I'm sick of living, guy. I'm sick of listening to my wife suffer. I'm sick of living. Sick. Life's never gonna get better. It's—life's a lost cause. Nobody's ever . . . gonna help my wife. Now I fucked up. Now I fucked up for good." These statements were largely hearsay ("I wish" "I don't care" "I'm sick" "Nobody's ever") and had no relevance if they were not admitted for their truth content.[6] To the extent that any of these statements were not hearsay ("Life's never gonna get better"; "life's a lost cause"), they had no apparent relevance. His subsequent statements were similar: "I should've just fuckin' shot myself. It would've been easier. Maybe I could've done that right." "My life don't exist anymore." The mere fact that he made these statements after shooting his wife had no apparent relevance. The same is true of defendant's request that the officer give him a gun so he could kill himself.

---

[5] The same is true of defendant's statements seeking updates on Roxana's condition.

[6] Defendant also identifies as nonhearsay his response when asked when he had last washed his hands. Defendant said "[a] week ago." It is impossible to identify any nonhearsay value of this statement. It had no relevance unless it was true.

We find no abuse of discretion in the trial court's determination that, to the extent that any of these statements had any nonhearsay value, it was substantially outweighed by the danger of confusing the jury and appealing to the jury's sympathies rather than providing relevant and material evidence. The court did not err in ruling that these statements were not admissible.

### 4. *Spontaneous Statements*

Defendant claims that his hearsay postarrest statements about his wife's condition and his desire to kill himself were admissible as spontaneous statements.

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) " 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. . . . In performing this task, the court "necessarily [exercises] some element of discretion . . . ." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 519.)

To qualify for admission as a spontaneous statement, the statement must not only purport to describe an event perceived by the declarant but also it must be true that the same event caused the declarant's excitement. The trial court could have reasonably concluded that defendant's "stress of excitement" was caused by his perception of shooting Roxana, not by his perception of Roxana's preexisting condition or by his desire to kill himself. On this basis, the court could have concluded that these statements did not qualify for admission as spontaneous statements.

### 5. *State of Mind*

Defendant also contends that these statements were admissible under Evidence Code sections 1250 and 1252.

17

Evidence Code section 1250 provides: "(a) Subject to [s]ection 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." However, "[e]vidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." (*Id*., § 1252.)

The trial court found that defendant's statements were not trustworthy because they were made to the police after defendant had been arrested for shooting Roxana. " 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion.' [Citation.] A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion." (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820.)

We find no abuse of discretion. Defendant's statements were made to the police after he had been arrested for shooting Roxana. At that time, he had every incentive to minimize his culpability for the shooting, and the trial court could have reasonably concluded that defendant's statements were aimed at providing a slanted narrative that defendant believed would support some sort of defense. We reject defendant's claim that the trial court erred in ruling that his postarrest statements were not admissible.

18

### B.     Evidence of Roxana's Conduct

Defendant contends that the trial court prejudicially erred in excluding evidence of Roxana's conduct outside of defendant's presence.  He claims that this evidence would have "corroborated" his testimony about her mental condition and behaviors.

#### 1.     Background

The prosecution filed an in limine motion seeking exclusion of the testimony of Frances Watson and Jaime Alfaro on the grounds that their "proposed testimony" lacked foundation, was irrelevant, and was based on inadmissible hearsay.[7]  The prosecution argued that Frances Watson should not be permitted to testify to "her opinion of the victim's mental health" or "mental health diagnosis" because she lacked expertise and her opinions were irrelevant and based on hearsay.  The prosecution contended that Jaime Alfaro should not be permitted to testify to "anecdotes" about events that occurred "long before" the shooting and lacked any relevance to defendant's actions and state of mind on the day of the shooting.  The prosecutor's objections were based on the public defender's investigator's reports on these two witnesses, which were attached to the in limine motion.

The trial court took up the prosecution's motion at the hearing on in limine motions.  It noted:  "Because I only have from the People's motion, I have investigative statements.  And it is a little bit difficult to appreciate from those statements the basis of the knowledge or what particularly the Defense would be seeking to do with those witnesses."  Defendant's trial counsel told the court that Frances Watson would not be testifying to any "diagnosis" and would testify that she had "observed" defendant's "interactions" with Roxana.  The trial court ruled that testimony by Frances Watson about those interactions would be admissible.

---

[7] The motion also sought exclusion of a third defense witness's testimony, but that witness did not testify and is not at issue on appeal.

Defendant's trial counsel told the court that Jaime Alfaro would testify that Roxana had "stayed with him for some time. He couldn't take it. When she was around everyone gets tensed because . . . it's like having a crazy child in the house. She doesn't make any sense. And the statement that was provided by him for the prosecution is Jamie [*sic*] Alfaro['s] specific observations of his sister's behavior while she was living with him." "She would scream. She would throw things on the ground. She would be nonresponsive. She would wander around and not return. She would make people uncomfortable with the way that she would, you know, interact with or stare at nothing or clutch at random things without there being anything to interact with. [¶] Jamie [*sic*] Alfaro experienced Roxana Watson's symptoms while living with her personally and can describe that." When the court asked when Roxana had lived with Jaime Alfaro, defendant's trial counsel expressed uncertainty and suggested that it might have been in 2012 or 2013. Defendant's trial counsel also said that Jaime Alfaro would testify about his "interactions with [defendant]" about Roxana.

The trial court offered "a few comments to tell you where my thinking is at the moment." The court rejected the prosecution's motion to preclude Jaime Alfaro and Frances Watson from testifying. The court was "a little bit more uncertain" about the admissibility of testimony about "observations of Roxana Watson outside the presence of [defendant] and how she may have been as a person generally because that is not as informative and probative as to how [defendant]'s state of mind may have developed and what his intent, motivation, and mental processes may have been on the date of the incident. But I'm still pondering that . . . ."

The court returned to this issue later that day. Defendant's trial counsel told the court that "it may be that the information that I can put in front of the jury about what [defendant] himself saw will be limited to what other individuals saw him experience with Mrs. Watson" But she contended that "[l]imiting information to the jury solely to what someone observed Roxana doing with [defendant] there would essentially—it

would deprive the Defense of giving the jury a full perspective on what the true nature of Roxanna's [*sic*] behavior is." She argued that evidence of Roxana's behavior outside defendant's presence was needed to avoid the jury getting the impression "that this is somehow something [defendant] brought upon himself to counterbalance that to the false impression." The court remained concerned that "[w]ithout [defendant]'s subjective appreciation of any of those facts, the issues are meaningless to the jury." It said: "I don't think that it is appropriate, sufficiently probative and necessary for the jury to hear specific instances of behavior of Roxana Watson that cannot be tied to observations or knowledge that the defendant had of those behaviors." Defendant's trial counsel asked the court whether evidence could be admitted that someone other than defendant had experienced behavior by Roxana that was similar to that experienced by defendant. The court said "I think no . . . ."

The court returned to this issue again after the prosecution rested and before the defense case began. At this point, the court expressed a more refined position: "[H]ow Roxana behaved outside of [defendant]'s presence with other people on specific days or times when [defendant] was not present, I think based on relevance and Evidence Code [s]ection 352, I don't think the jury needs to hear extensive testimony and detail from witnesses talking about her behavior and such at times when [defendant] was not interacting with her or was not present. [¶] However, as I have tried to articulate, I do think as a general matter the jury can learn a fact like, for example, Roxana was living with me—from a witness—and I was not able to care for her or I was not able to maintain that and so I advised the family . . . ."

Frances Watson subsequently testified without objection about Roxana's behaviors, although she testified she "never saw her," never went to the apartment where defendant and Roxana were living together, and "didn't interact with her much." She testified that Roxana would leave the house and wander the street, and that she "just wasn't right" and was "just basically shut off." Frances Watson testified that Roxana

21

would not take her medication or see doctors. She also testified that once Roxana was gone for a whole day and returned "just walking like a zombie," with a sunburned face, and unresponsive. Frances Watson also testified that when Roxana lived in an apartment by herself, she was unable to care for herself. The apartment was "a filthy mess," and there was no food in the refrigerator. The trial court did not limit this testimony in any way.

Jaime Alfaro, Roxana's brother, testified that Roxana had been "diagnosed schizophrenia paranoia." The prosecution's objection was overruled. Alfaro testified that Roxana was hospitalized 10 times for as long as four months at a time. He also testified that Roxana lived with defendant "the whole time after she got sick." She tried to avoid taking her medication, and when she took the medication she was "like a zombie." He testified that, at some indeterminate time before the shooting, he observed Roxana when she was not taking her medication: "She walked around the house a lot nonstop. I would say seven hours walking and she will give you dirty looks and keep walking and walking and walking. She will not sleep at night. She stayed up all night until 6:00 in the morning. Maybe she sleep a couple hours after that but very scary." The only testimony that was excluded was Alfaro's testimony that his kids were afraid of Roxana. Jaime Alfaro's testimony made clear that Roxana never lived with him before the shooting and only lived with him for a couple of weeks *after* the shooting. He testified that he did not see her or defendant in 2012 or 2013.

### 2. *Analysis*

Defendant claims that the trial court erroneously *excluded testimony* by Frances Watson and Jaime Alfaro about Roxana's "general behavior." The Attorney General responds that the trial court did not make a ruling excluding the testimony that defendant premises his contention upon because no such testimony was offered by the defense and rejected by the court. Defendant replies that the "ruling" he is challenging is the trial

22

court's statement at the in limine hearing concerning "specific instances of behavior" of which defendant had no knowledge.

Defendant's claim of error cannot succeed because the record does not reflect that the court made a ruling excluding any specific proffered testimony by these witnesses about Roxana's behavior prior to the shooting. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) the substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination." (Evid. Code, § 354.)

Defendant makes no effort to address the context in which the trial court made the statements that he claims were a ruling concerning the potential admissibility of testimony by these two witnesses.

The court was never asked to rule on the admissibility of specific testimony by Frances Watson about Roxana's behaviors outside of defendant's presence. When the trial court inquired "what particularly the Defense would be seeking to do with" Frances Watson, defendant's trial counsel said only that she would testify that she had "observed" defendant's "interactions" with Roxana, and the court ruled that testimony admissible. The trial court did not exclude any evidence during Frances Watson's testimony, so there is no basis for defendant's claim that any of her testimony was excluded.

Although the situation with Jaime Alfaro is more complicated, it also does not disclose any trial court error. Defendant's trial counsel told the court at the in limine hearing that Jaime Alfaro would testify about his "interactions with [defendant]" about Roxana and to "specific observations of his sister's behavior *while she was living with*

*him.*" (Italics added.) Defendant's trial counsel identified the observations that Jaime Alfaro had made when Roxana was living with him: "She would scream. She would throw things on the ground. She would be nonresponsive. She would wander around and not return. She would make people uncomfortable with the way that she would, you know, interact with or stare at nothing or clutch at random things without there being anything to interact with." When the court asked *when* it was that Roxana had *lived with Jaime Alfaro*, defendant's trial counsel expressed uncertainty and suggested that it might have been in 2012 or 2013. In light of Jaime Alfaro's testimony that he had no contact with Roxana in 2012 or 2013 and that the only time she had lived with him was for two weeks *after the shooting*, the defense did not establish that Jaime Alfaro's observations of her behavior had any relevance. In any case, the trial court certainly did not abuse its discretion in finding under Evidence Code section 352 that any minimal relevance that Roxana's post-shooting behavior might have was substantially outweighed by the risk of confusing the jury.[8]

We should also point out that the court's statements during the in limine hearing were not the court's final thoughts on this matter. Before the defense case even began, the trial court provided an additional explanation of its position, which demonstrated that it was *not* excluding *all* testimony by these witnesses about Roxana's behaviors outside defendant's presence. Instead, the court explained that its position was that, under "Evidence Code [s]ection 352, I don't think the jury needs to hear *extensive testimony and detail* from witnesses talking *about her behavior* and such at times when [defendant]

---

[8] Trial courts have the discretion to exclude evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Since neither Frances Watson nor Jaime Alfaro had observed Roxana's behavior during the time that Roxana and defendant were living together in 2013, their observations of her behavior had little probative value.

24

was not interacting with her or was not present." (Italics added.) While the court expressed a desire to limit the *extent* of the testimony about Roxana's behaviors outside defendant's presence, it did not identify any specific testimony as inadmissible, and defendant's trial counsel made no attempt to clarify any limitation. Instead, she proceeded to present testimony from not only Frances Watson and Jaime Alfaro but also from a friend of defendant about Roxana's behaviors in their presence, without making any effort to explicitly demonstrate that those behaviors had taken place in defendant's presence. Consequently, we reject defendant's claim that the trial court erroneously excluded testimony by Frances Watson and Jaime Alfaro about Roxana's behaviors outside defendant's presence.

### C. Roxana's Mental Health Records

Defendant also contends that the trial court's in camera review of Roxana's mental health records was tainted by the court's erroneous belief that her conduct outside of defendant's presence was inadmissible, and he asks this court to review the mental health records to determine whether the court erred in failing to disclose additional documents to the defense. Defendant argues that this evidence would have corroborated her mental health condition and supported his provocation claim.

#### 1. Background

The defense subpoenaed Roxana's mental health records in advance of trial and asked the court to review them in camera, and Roxana's Kaiser mental health records were provided to the court on a CD. After the court told defendant's trial counsel at the in limine hearing of its concerns about the admissibility of evidence of Roxana's behavior outside defendant's presence, the court said "it's for these same reasons and where I am with the issues right now that at this time I'm not going to go in camera and look at Roxana Watson's records." Defendant's trial counsel nevertheless urged the court to review these records. She argued that these records would provide "independent documentation" showing that the descriptions of her conduct by defendant and "family

25

members" were not "self-serving and exaggerate[d]." The court said it would "continue to ponder" the issue and took it under submission.

When the court returned to this issue after the prosecution rested, defendant's trial counsel argued that these records would provide evidence of defendant's "interactions" with Roxana "in the context of hospital visits and hospital stays." She argued that these records would also show Roxana's diagnosis, the length of time she had been experiencing symptoms, her medication compliance, her behavior when on or off medication, and the consistency of her behavior. Defendant's trial counsel told the court that the "strongest point" she wanted to make about these records concerned the interactions between defendant and Roxana "in the hospital context and in [the] doctor context." The prosecution argued that this information was mostly available from other defense witnesses and that the remainder was irrelevant. The court then agreed to review the records in camera.

After defendant had testified, defendant's trial counsel argued that Roxana's mental health records were necessary to corroborate defendant's testimony that Roxana was severely mentally ill. The trial court, after reviewing Roxana's mental health records in camera, ruled that 15 pages of documents from Roxana's mental health records should be released to defendant.[9] When the defense sought admission of these documents, the prosecution objected to "hearsay statements" in these documents. The defense clarified that it sought admission of "nonhearsay statements of [defendant]" in these documents to show defendant's state of mind. The court ruled that 10 of the 15 pages were admissible, and they were admitted into evidence.[10] Those 10 pages were records from 2008 through

---

[9] The disclosed documents were initially identified as exhibit E.

[10] The five pages that were not admitted were extracted from exhibit E and marked as Court exhibit AA. Defendant does not contend that the trial court erred in ruling that these five pages, which concerned Roxana's 2002 hospitalization, were not admissible.

26

2010 that largely documented defendant's statements to Kaiser clinicians about Roxana's behavior.

### 2. Analysis

Defendant asks us to review Roxana's mental health records to determine whether the trial court erroneously failed to disclose additional documents that would have shown "Roxana's general behavior, which [would] corroborate appellant's testimony and other admitted evidence."

In the trial court, defendant asked the court to release documents from Roxana's mental health records that could demonstrate the severity of Roxana's mental illness, her medication compliance, her behavior both on and off medication, the consistency of her behavior, and the interactions between defendant and Roxana "in the hospital context and in [the] doctor context." The documents released by the trial court consisted of records that recounted defendant's statements to Kaiser clinicians, which were admitted, and records of Roxana's 2002 hospitalization, which were not admitted.

Unfortunately, the CD containing Roxana's mental health records has been lost by the superior court. Thus, we cannot review those records. We asked the parties to submit supplemental briefing addressing how we should proceed on this issue under the circumstances. Defendant argues that we "must assume that [defendant] would have been able to present mental health records fully corroborating his descriptions of Roxana's behavior and the effect of that behavior on him." He claims that having the trial court prepare a settled statement would not provide for meaningful review because it is not likely that the trial court would recall details of "Roxana's specific diagnoses by her various doctors; her prescriptions; her dosages; the time periods associated with her prescriptions and diagnoses; or any relevant statements she made for the purpose of treatment." The Attorney General, on the other hand, argues that a settled statement would afford meaningful review and offers no other suggestions.

27

In *People v. Townsel* (2016) 63 Cal.4th 25, the California Supreme Court concluded that where the record was inadequate for meaningful review of a trial court's in camera examination of confidential records, reversal would be required only if the defendant had been prejudiced by the trial court's failure to disclose additional records. (*Id.* at pp. 69-71.) Under this standard, we find no cause for reversal here.

While we accept defendant's suggestion that we should assume that additional mental health records would have corroborated defendant's descriptions of Roxana's conduct, we cannot accept his claim that we should assume that disclosure of additional documents from Roxana's mental health records would have corroborated "the effect of that behavior on him." Nothing in the record suggests that Roxana's mental health records could have produced admissible evidence demonstrating the impact of her behavior on defendant. At most, those records might report *defendant's statements* about the impact of her behavior on him. Indeed, the records that were disclosed to the defense largely reported defendant's statements to her clinicians. And those records were admitted at trial. We decline to assume that additional records would have done anything more than corroborated defendant's descriptions of Roxana's conduct.

Defendant does not support his claim that the court's failure to disclose additional records corroborating his descriptions of Roxana's conduct prejudiced him. There was no significant dispute at trial about the nature of Roxana's behavior. Defense witnesses corroborated defendant's descriptions of her behavior, and the mental health records that were both disclosed and admitted also corroborated those descriptions. Additional records would have been merely cumulative. Nor was there any need for additional information about her diagnosis and prescribed medication, as the admitted records already addressed those issues. Defendant presented unchallenged evidence that Roxana was a paranoid schizophrenic who refused to take her medication. Accordingly, any error by the trial court in failing to order that additional documents in Roxana's mental health records be disclosed to defendant was harmless.

28

**D.**     *Admissibility of Minagawa's Testimony That Defendant was Suicidal*

Defendant contends that the trial court prejudicially erred in striking Minagawa's testimony that defendant was suicidal at the time of the shooting.

**1.     *Background***

The prosecution brought an in limine motion seeking to preclude Minagawa from giving testimony about defendant's mental state at the time of the shooting. The prosecution argued that such testimony would violate section 29. At the hearing on the motion, defendant's trial counsel assured the court that Minagawa "will not testify to any forbidden statements such as this is [defendant]'s specific intent." The court stated that it would not permit Minagawa to "attribut[e] a certain mental state to [defendant] at the time of the events," and defendant's trial counsel confirmed that it was "not the Defense's intention to offer" any such testimony.

During defendant's trial counsel's examination of Minagawa, the following colloquy occurred: "Q. Did you consider whether or not he was suicidal or actively considering suicide on December 3rd, 2013? [¶] A. Yes. [¶] Q. Did you believe that he was? [¶] A. Yes." The prosecutor objected on the grounds that the question was "[o]utside this person's expertise" and "goes to the ultimate conclusion." The court sustained the objection and struck the answer. Minagawa proceeded to testify without objection that defendant was suffering from depression at the time of the shooting, that his "judgment" "would be impacted" by his depression, and that he "would not be able to regulate his emotions."

**2.     *Analysis***

Defendant claims that neither of the stated grounds for the prosecutor's objection was valid. He argues that defendant's "suicidal mental state was a relevant factor" in Minagawa's "diagnosis" and "within his expertise as a psychologist." Defendant also contends that Minagawa's "opinion that appellant was suicidal did not go to the ultimate conclusion" because it was not an element of the crime or a defense, and in any case

expert opinion testimony may permissibly address "the ultimate issue." He claims that the invalidity of the stated grounds means that the trial court erred in striking Minagawa's answer.

Defendant ignores the fact that the trial court had already ruled in limine that Minagawa would not be permitted to testify about defendant's mental state at the time of the shooting. Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant *had or did not have the required mental states*, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

Defendant claims that Minagawa could properly testify that defendant was suicidal at the time of the shooting because that state of mind "was not an element" but merely "supported an inference that his state of mind at the time of the crime was not sufficient to satisfy" the malice element of attempted murder. He maintains that "psychologists have been routinely allowed to testify regarding a defendant's state of mind at a time prior to their examination." None of the cases in the string cite he relies upon to support this proposition considered whether section 29 precludes expert testimony about a defendant's state of mind at the time of the crime. However, in a case not cited by defendant, *People v. Herrera* (2016) 247 Cal.App.4th 467, the majority held that expert testimony about the mental state of a defendant at the time of the offense was admissible notwithstanding section 29 so long as the expert did not testify that the defendant had or did not have the mental state required for conviction of the offense. (*Id*. at p. 476.)

Even if we assume that the majority reached the correct conclusion in *Herrera*, we still would not find error here. The defense had assured the court at the in limine hearing that Minagawa would *not* be testifying about defendant's state of mind at the time of the shooting, and the defense's examination of Minagawa did not disclose that Minagawa

30

had any source of information about defendant's mental state *at the time of the offense* other than defendant's statements and testimony. The trial court could reasonably conclude that Minagawa's expertise did not extend to determining the truth of defendant's claim that he was suicidal at the time of the shooting. Accordingly, we reject his claim that the trial court erred in striking Minagawa's "Yes" answer on the ground that it was outside Minagawa's expertise.

### E.      *Provocation:  Instruction and Argument*

Defendant argues that the trial court prejudicially erred in denying his request for a special instruction rather than the standard CALCRIM No. 603 attempted voluntary manslaughter instruction. He also contends that the prosecutor committed misconduct during closing argument by stating that Roxana's conduct could not be provocation and that any argument that it built up over time was invalid because that would be premeditation, and by claiming that defendant had the burden of proving that he acted in the heat of passion.

### 1.      *Background*

The defense asked the court to give a modified version of CALCRIM No. 603. The requested instruction read: "To prove the malice element of the attempted murder charge the prosecution must prove beyond a reasonable doubt that the defendant did not attempt to kill because of a sudden quarrel in the heat of passion. [¶] To meet this burden the prosecution must prove at least one of the following beyond a reasonable doubt: [¶] 1. The defendant was not provoked [¶] OR [¶] 2. As a result of the provocation the defendant did not act rashly and under the influence of intense emotion that obscured his/her reasoning or judgment [¶] OR [¶] [3.] The provocation to which defendant responded would not have caused a person of average disposition to act rashly without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

31

[¶] In order for the prosecution to disprove the heat of passion and prove the defendant guilty of attempted murder rather than attempted voluntary manslaughter, the prosecution must prove beyond a reasonable doubt that the defendant did not act under the direct and immediate influence of provocation as I have defined it. [¶] You must decide, if you can, whether the defendant was unprovoked or whether the provocation was insufficient. In attempting to decide whether the provocation was insufficient, consider whether the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment."

The court rejected this request. It instructed the jury: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion. [¶] The defendant attempted to kill someone because of a sudden quarrel or in a heat of passion if: [¶] One, the defendant took at least one direct but ineffective step toward killing a person; two, the defendant intended to kill that person; three, the defendant attempted the killing because he was provoked; four, the provocation would have caused a person of average disposition to act rashly and without due deliberation that is from passion rather than from judgment; and, five, the attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for a sudden quarrel or heat of passion to reduce an attempted murder to attempted voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. [¶] While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and

32

whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts could have reacted from passion rather than judgment. [¶] If enough time passed between the provocation and the attempted killing for a person of average disposition to cool off and regain his clear reasoning and judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of the attempted murder."[11] The court also instructed the jury: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

The prosecutor argued to the jury: "He deliberated. It wasn't a rash decision. It wasn't based on emotion. He thought of his options. He considered what he would do— what he could do." She also repeatedly told the jury that "[t]he Defense doesn't have to do anything." When she discussed attempted voluntary manslaughter, she told the jury: "And this concept of provocation is important because if there was no provocation then all you have is attempted murder. It's not reduced." At this point, defendant's trial counsel objected, without stating a reason, and the court overruled the objection. The prosecutor continued: "In order to reduce it from attempted murder to voluntary manslaughter one of the important elements is that there be provocation. What is the provocation? Provocation means that the defendant—the law says the defendant must have acted under the direct and immediate provocation. It's not, I was provoked last year. And now I've thought of this provocation and I'm going to attempt to kill you this

---

[11] The court also told the jury: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

year 'cause that's premeditated and deliberated. It has to be the direct and immediate influence of the provocation." The prosecutor emphasized that "[t]he provocation has to come from the victim." "And Roxana's mental health and mental illness is not provocation. Her existence and the way she lives is not provocation. The fact that she wanders the streets is not provocation. In the same way that someone would with Alzheimer's not knowing who the person they're talking to is or someone with a physical disability, just the fact that they have that and they act that way that's not provocation." At this point, defendant's trial counsel again objected, without stating a reason, and the trial court overruled the objection. The prosecutor continued: "They called the witnesses to the stand they all had time throughout their relationship and you did not hear any evidence of provocation. Certainly not evidence sufficient to have an objective person react without thinking." "She acts crazy everyday. That's not provocation and that's not the emotion."

The prosecutor argued: "It's also important to note that the law says if there's a cooling off period, if there's some time during which this average objective person, again, not the defendant, but the standard we set as a society, if this average objective person has had time to regain his judgment, then it's not voluntary. Then it's premeditated. Because if you get provoked, if you find that it's provocation and, again, you take time to think about it, cool off, come back the next day, a week later three years later and act on that, the objective person would have had a chance to regain their judgment and act on that judgment not on emotion." The prosecutor argued that defendant's testimony was not credible.

Defendant's trial counsel argued to the jury: "In fact, he has no obligation to prove he was under the influence of an intense emotion. The prosecutor has the obligation to prove to you beyond a reasonable doubt that he wasn't. It's not reducing it. She has to prove to you that he was not feeling like he wanted to die." Defendant's trial counsel emphasized that the prosecution "has the burden of proving" that defendant did

34

not act in the heat of passion as a result of provocation. "[Y]ou ask, did the prosecutor prove to me beyond a reasonable doubt that this average person confronted with [defendant's] impossible situation would not have acted from passion?"

The prosecutor's final argument reiterated her view of the evidence. "The provocation has to come from the victim. It's not provocation builds up over time because if it built up over time it would have been premeditated." At this point, defendant's trial counsel objected without specifying a reason, and the court overruled the objection and rejected her request to approach. The prosecutor continued: "It can occur over a short or long period of time. If someone's taunting you every day, if someone is threatening you every day for a week, that's a long time and that's provocation." "Would an average person react from passion and not judgment if someone said, I don't want to give you a hug."

### 2. *Requested Instruction*

Defendant claims that the trial court prejudicially erred in refusing to give the requested instruction because CALCRIM No. 603 "confused the jury under the totality of the circumstances."

He relies heavily on *People v. Franklin* (2018) 21 Cal.App.5th 881 (*Franklin*), but the decision in *Franklin* is inapposite. In *Franklin*, the defendant was charged with attempted murder, and the trial court instructed the jury with CALCRIM No. 603. During deliberations, the jury submitted a request for clarification as to whether " 'all our criterion [*sic*] need to be met for attempted voluntary manslaughter.'" (*Franklin*, *supra*, at p. 888.) The court responded that, for defendant to be convicted of attempted voluntary manslaughter, " 'the People must prove beyond a reasonable doubt all five elements enumerated in [CALCRIM No.] 603.' " (*Ibid.*) The Court of Appeal held that the court's *response* conflicted with CALCRIM No. 603 because the response told the jury that the prosecution bore the burden of *proving provocation*, when in fact the prosecution bore the burden of proving *the absence of provocation*. The court did not

35

find any flaws in CALCRIM No. 603, and it explicitly noted that CALCRIM No. 603 "properly set forth the burden of proof." (*Franklin*, *supra*, at p. 890.)

A trial court may properly refuse to give a requested instruction where the points made in the requested instruction are adequately covered in a standard instruction that is given. (*People v. Catlin* (2001) 26 Cal.4th 81, 152.) Here, the burden of proof concerning provocation was correctly and adequately covered in the standard version of CALCRIM No. 603. Nothing in the decision in *Franklin* suggests otherwise.[12] While the defense preferred the wording of the requested instruction, that preference did not obligate the trial court to substitute the requested instruction for the correct and adequate pattern instruction. We find no error in the trial court's refusal to give the requested instruction.

### 3.    *Prosecutorial Misconduct*

Defendant contends that the prosecutor (1) erroneously told the jury that "Roxana's behavior caused by her mental health issues could not be provocation," (2) improperly argued that "provocation could not build up over time," and (3) "wrongly suggested that appellant bore the burden of proving that he acted in the heat of passion."

"A prosecutor is given wide latitude during closing argument." (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood

---

[12] Defendant draws our attention to a footnote in *Franklin*, which he does not quote in its entirety, from which he extracts just half a word (" 'odd[]' ") and purports it to have been a characterization of the "structure" of CALCRIM No. 603. The footnote reads: "The confusion here arises from the oddity that the circumstances listed in CALCRIM No. 603 are not all *elements* of attempted voluntary manslaughter." (*Franklin*, *supra*, 21 Cal.App.5th at p. 889, fn. 6.) This footnote does not suggest that CALCRIM No. 603's unusual "structure" would have caused any "confusion" to a jury in the absence of the *Franklin* trial court's erroneous response to the jury's inquiry.

that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Ibid.*)

The prosecutor did not argue that *the law precluded the jury from considering* whether Roxana's behavior constituted provocation. Instead, she argued that Roxana's behavior as shown by the evidence in this case "is not provocation." We see no impropriety in this argument. Whether Roxana's behavior was provocation was the critical issue in the case. The prosecutor was entitled to argue to the jury her position that the evidence in this case did not demonstrate any provocation.

Defendant's challenge to the prosecutor's argument regarding the "build up" of provocation is also meritless. The prosecutor argued that defendant could not have been provoked by Roxana's behavior long before the shooting because heat of passion applied only where defendant acted under the "direct and immediate influence of the provocation" and without a "cooling off period" during which he could have regained his judgment. Defendant did not and does not object to these arguments. He challenges a subsequent snippet of the prosecutor's argument: "It's not provocation builds up over time because if it built up over time it would have been premeditated." However, he fails to acknowledge that the prosecutor followed that snippet by acknowledging that provocation "can occur over a short or long period of time. If someone's taunting you every day, if someone is threatening you every day for a week, that's a long time and that's provocation." Taken in context, the jury could not reasonably have understood the prosecutor to be arguing that a person's behavior over time could not constitute provocation but only that Roxana's behavior did not constitute "built up" provocation because defendant had had time to cool off and use judgment to plan a response.

The jury was especially unlikely to misinterpret the prosecutor's "built up" argument because the court had told the jury that it "must follow my instructions" if "the attorneys' comments on the law conflict with my instructions . . . ." The court had instructed the jury that defendant had to have acted "under the direct and immediate

37

influence of provocation," that "[s]ufficient provocation may occur over a short or long period of time," and that heat of passion did not apply "[i]f enough time passed between the provocation and the attempted killing for a person of average disposition to cool off and regain his clear reasoning and judgment . . . ." Under these circumstances, we find no improper argument by the prosecutor in this regard.

Defendant's final challenge to the prosecutor's argument is his claim that the prosecutor "wrongly suggested that appellant bore the burden of proving that he acted in the heat of passion."

Defendant first focuses on a small section of the prosecutor's argument. After noting that the defense was seeking an attempted voluntary manslaughter verdict, the prosecutor argued: "An attempted voluntary manslaughter is still homicide, but it is one that is done either in a sudden quarrel or under the heat of passion. And so it reduces it from premeditated to voluntary manslaughter. And the idea is that if a person acts in a sudden quarrel or the heat of passion, their conduct is not excused. You just don't say you are having this emotion, don't worry about it. But we recognize it it's not as calculated. It's not premeditated. [¶] To prove attempted voluntary manslaughter there are several factors." The prosecutor went on to observe that the first two "element[s]" of attempted voluntary manslaughter were the same as the elements of attempted murder: a direct but ineffective step coupled with the intent to kill. "The third element is that the defendant attempted the killing because he was provoked. And this concept of provocation is important because if there was no provocation then all you have is attempted murder. It's not reduced." Defendant's trial counsel objected at this point, and the court overruled the objection.

Defendant argues that the portion of the prosecutor's argument to which his trial counsel objected was improper. He contends that the prosecutor's use of the phrases "to prove" and "reduce it" suggested that defendant bore the burden of proving heat of passion. We agree with defendant that there was some merit to his trial counsel's

38

objection below, as the prosecutor's argument that provocation was an *element* of the crime of attempted voluntary manslaughter and that provocation's absence meant that the crime was attempted murder had the potential to confuse the jury about who bore the burden of proof of provocation. However, when the prosecutor's entire argument is considered in context, we do not find that the jury was likely to be misled about the burden of proof.

The prosecutor repeatedly told the jury that the defense bore no burden: "[T]he Defense doesn't have to do anything." And she never argued that the defense had failed to prove provocation. Instead, she argued that "in this case from all the evidence you've heard whether it's by the People or by the Defense there is simply no provocation." "[Y]ou did not hear any evidence of provocation. Certainly not evidence sufficient to have an objective person react without thinking." We do not believe that in this context the jury would have understood the prosecutor's potentially misleading statements as placing the burden on defendant to prove provocation when she had expressly told the jury repeatedly that defendant had no burden and her argument was that there was not "any evidence of provocation," no matter its source.

Furthermore, any residual risk that the prosecutor's argument might mislead the jury was eliminated by the court's instruction to the jury to credit the court's instructions rather than the arguments of counsel. Since the court properly instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion," we find there was no reasonable likelihood that the jury was actually misled by the prosecutor to believe that the defense bore the burden of proving provocation.[13]

---

[13] Defendant also claims that another portion of the prosecutor's argument, which focused on the lack of evidence of provocation, suggested that the defense bore the burden of proving provocation. The prosecutor argued: "They called the witnesses to the stand they all had time throughout their relationship and you did not hear any evidence of

*F.* *Cumulative Prejudice*

Defendant also contends that there was cumulative prejudice from multiple errors. Since we have found only one assumed error that was harmless, there is no cumulative prejudice.

*G.* *Life Term*

The trial court imposed a term of "7 years to life," which it also called a "term of life with the possibility of parole after seven years" for the attempted murder count. Defendant claims that this sentence was "unauthorized" and that the court should have simply imposed an indeterminate term of life with the possibility of parole.

Section 664, subdivision (a) provides: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in [s]ection 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for *life with the possibility of parole*." (Italics added.) Section 3046 provides that "[a]n inmate imprisoned under a life sentence shall not be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years." (§ 3046, subd. (a).)

The only case defendant cites in support of his claim is *People v. Robbins* (2018) 19 Cal.App.5th 660. In *Robbins*, the Court of Appeal accepted the Attorney General's concession that the defendant should have been sentenced to "life with the possibility of parole" rather than "seven years to life." (*Id*. at p. 678.) However, the Court of Appeal offered no analysis of the issue and simply cited section 664 without mentioning section 3046.

The *Robbins* opinion also did not mention the California Supreme Court's decision in *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*). In *Jefferson*, the issue was whether the Three Strikes law required the doubling of the minimum term for

provocation. Certainly not evidence sufficient to have an objective person react without thinking." Defendant's trial counsel made no objection to this argument below, thereby forfeiting this claim. (*People v. Brown* (2003) 31 Cal.4th 518, 553.)

attempted murder with premeditation. The California Supreme Court considered the provisions of both section 664 and section 3046 and concluded that for doubling purposes the sentence for attempted murder with premeditation was a life term with a seven-year minimum term. "[T]he minimum term for a defendant found guilty of attempted premeditated murder is found not in section 664 but in section 3046." (*Jefferson*, *supra*, at p. 96.) The California Supreme Court also agreed with the Attorney General that "it is not improper for the trial court to include, as part of a defendant's sentence, the minimum term of confinement the defendant must serve before becoming eligible for parole. . . . By including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate minimum term to apply, and it informs victims attending the sentencing hearing of the minimum period the defendant will have to serve before becoming eligible for parole." (*Id.* at p. 101, fn. 3.)

Defendant points out that *Jefferson* is not directly on point because it dealt with the Three Strikes law, but we find the California Supreme Court's analysis in *Jefferson* persuasive even outside the Three Strikes context. We conclude that a trial court may properly "include, as part of a defendant's sentence, the minimum term of confinement the defendant must serve before becoming eligible for parole" so as to give "guidance to the Board of Prison Terms regarding the appropriate minimum term to apply . . . ." (*Jefferson*, *supra*, 21 Cal.4th at p. 101, fn. 3.) Moreover, we fail to discern how the trial court's characterization of defendant's life sentence could have any impact on him. His indeterminate life sentence was *statutorily required* to have a minimum term of seven years regardless of how the trial court characterized the sentence. We reject defendant's claim.

### H. *Mental Health Diversion*

Defendant was sentenced in 2017. In June 2018, the Legislature enacted section 1001.36, "which created a pretrial diversion program for certain defendants with mental health disorders. (Stats. 2018, ch. 34, § 24.)" (*People v. Frahs* (2020) 9 Cal.5th

41

618, 624 (*Frahs*).)  In *Frahs*, the California Supreme Court held that section 1001.36 applies retroactively to all cases that were not final when that section was enacted. (*Frahs*, *supra*, at pp. 630-637.)  Defendant's case is not yet final, and there was evidence that he suffers from a qualifying mental health disorder.  The California Supreme Court held that the appropriate remedy in such cases is a remand for the trial court to consider the defendant's eligibility for diversion under section 1001.36.  (*Frahs*, *supra*, at p. 641.) The Attorney General concedes that such a remand is required in this case, and we agree that the California Supreme Court's decision in *Frahs* compels a remand here.

### I.      *Firearm Enhancement*

When defendant was sentenced in August 2017, the trial court lacked discretion to strike the section 12022.53 firearm enhancement.  (Former § 12022.53.) Section 12022.53 was amended, effective January 1, 2018, to add section 12022.53, subdivision (h).  (Stats. 2017, ch. 682, § 2.)  Section 12022.53, subdivision (h) grants trial courts discretion to strike section 12022.53 enhancements, and it has been held retroactive to all cases that were not yet final when it took effect.  (*People v. Watts* (2018) 22 Cal.App.5th 102, 119 (*Watts*).)  In *Watts*, the Court of Appeal held that the appropriate remedy was a remand for the trial court to exercise its discretion under section 12022.53, subdivision (h).  (*Watts*, *supra*, at p. 120.)  Defendant's case is not yet final, and he seeks a remand for the trial court to exercise its discretion under section 12022.53, subdivision (h).  The Attorney General concedes that a remand for this purpose is appropriate, and we agree.

## VI.   DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions.  On remand, the trial court shall first consider mental health diversion.  " 'If the trial court finds that [defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the

court may grant diversion.  If [defendant] successfully completes diversion, then the court shall dismiss the charges.' " (*Frahs*, *supra*, 9 Cal.5th at p. 641.)  If the court "determines that [defendant] does not meet the criteria under section 1001.36, or if [defendant] does not successfully complete diversion" (*ibid.*), then the court shall exercise its discretion under section 12022.53, subdivision (h).  If the court decides not to strike the section 12022.53 enhancement, it shall reinstate the judgment.  If the court strikes the section 12022.53 enhancement, it shall file an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

DANNER, J.

*People v. Watson*
H045141